United States District Court
Eastern District of North Carolina
Western Division
Case No. 5:21-cv-00120

Shirley Lane,                          )
                                       )
        Plaintiff,                     )
                                       )
            v.                         )          Complaint
                                       )
Unum Life Insurance Company            )
of America,                            )
                                       )
        Defendant.                     )
_____ )

Plaintiff Shirley Lane alleges the following for her complaint against defendant

Unum Life Insurance Company of America ("Unum").

Nature of Controversy

1.      Ms. Lane worked as a Senior Loan Closing Processor for State Employee's

Credit Union ("SECU") in Raleigh, North Carolina until September 11, 2018. She was

unable to continue working beyond that date due to back injuries she sustained in a motor

vehicle accident in which she was hit from behind by a car traveling at 75 miles per hour.

2.      SECU provided long-term disability coverage to Ms. Lane and other

eligible employees pursuant to an insurance policy issued by Unum bearing group policy

number 415735 001 (the "Policy"). The Policy obligates Unum to make eligibility

determinations and to pay policy benefits from its funds.

3.      Unum approved Ms. Lane for long-term disability benefits effective

December 2, 2018. By a letter dated June 1, 2020, Unum notified Ms. Lane that her long-

term disability benefits had been terminated because, according to Unum, her medical records lacked physical examination findings that supported her claim of disabling pain. Ms. Lane timely appealed Unum's decision on November 17, 2020. By a letter dated February 17, 2020, Unum informed Ms. Lane that her appeal had been denied, she had exhausted her appeal rights under the Policy, and she had the right to bring a civil action under section 502(a) of ERISA.

4.　　　Ms. Lane claims she is entitled to recover long-term disability benefits from Unum pursuant to 29 U.S.C. § 1132(a)(1)(B) of ERISA. The relief Ms. Lane seeks is a determination that she is entitled to receive long-term disability benefits under the Policy retroactive to June 2, 2020, prejudgment interest, monthly long-term benefits for as long as she remains entitled to benefits under the terms of the Policy, and an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

<u>Parties, Jurisdiction, and Venue</u>

5.　　　Ms. Lane is a citizen and resident of Wake County, North Carolina.

6.　　　Unum is an insurance company and is authorized to conduct business in this state by the North Carolina Department of Insurance.

7.　　　The Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 1132(e)(1). Venue is proper in this district pursuant to 29 U.S. C. § 1132(e)(2) because acts and occurrences that gave rise to Ms. Lane's claim occurred in this district.

<u>Additional Facts</u>

8.　　　Unum's Policy provides the following definition of disability:

You are disabled when Unum determines that:

2

> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> - you have a 20% or more loss in your Indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, the definition of disability changes to "any gainful occupation:"

> After 24 months of payments, you are disabled when Unum determines that due to the same. sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

Unum began paying Ms. Lane long-term disability benefit as of December 2, 2018. Because Ms. Lane has received less than 24 monthly LTD payments, the "regular occupation" definition of disability remains in effect

    9.    According to SECU's job description, a Senior Loan Closing Processor is responsible for the preparation of loan closing documents, sending completed loan closing packages to closing agents, and providing guidance to other employees within the department.

    10.    On October 29, 2018, Dr. Brandon Burnsed of Raleigh Neurosurgical Clinic performed a transforaminal lumbar interbody fusion at L4-S1. Following the surgery, Ms. Lane experienced radicular pain in her left leg and a left foot drop. Dr. Burnsed determined that Ms. Lane had a compressed nerve at L4 that was caused by bone grafting and scarring.

    11.    On November 14, 2018, Ms. Lane was interviewed by a Unum claims representative who asked about her job duties. Ms. Lane responded that she processed

loans all day. She performed her loan processing work from a seated position and used a computer. She also had to be able to squat, bend, and lift files from file cabinets. Bending over was required because she needed to retrieve files from lower shelves. Ms. Lane advised Unum that she did a lot of walking to pick up files and return them to the storage drawers. She had to carry items to colleagues who worked at the other end of the building in which she worked.

12.     On December 14, 2018, Dr. Burnsed performed a repeat decompression of her left L4 nerve root to try to correct her foot drop. The operation was unsuccessful.

13.     Unum notified Ms. Lane by a letter dated December 21, 2018 that her claim for long-term disability benefits had been approved and her monthly benefit of $2,272.80 would be paid retroactively to December 2, 2018.

14.     On December 27, 2018, Ms. Lane was seen by Jack Bergman, PA-C in a follow-up visit to Raleigh Neurosurgical Clinic. Ms. Lane reported that she continued to experience significant pain and left foot drop. Mr. Bergman wrote that Ms. Lane was "rightfully distraught" about the results of her surgeries. Mr. Bergman summarized Ms. Lane's problems as follows:

> At this point, reexploration of her nerve roots demonstrated widely patent exiting left L4 and L5 nerve roots through their respective foramens. The L4 nerve root demonstrated significant erythema and appeared irritated. I have offered referring her to a psychiatrist to discuss her depression, but she states she is not ready at this time. She understands this is a standing offer. We will also refer her to the pain management group for her continuous left lower extremity radicular pain. Also, we will prescribe her outpatient physical therapy for her left lower extremity foot drop. We will follow-up with her in clinic in 6 weeks. She should remain out of work, at a minimum, until that time.

4

15.    On January 3, 2019, Ms. Lane had her first appointment with Dr. Thomas Weber, a pain management specialist at Midtown Pain and Spine Clinic. Dr. Weber increased Ms. Lane's dosage of Cymbalta 60 mg once a day to twice a day, prescribed Tramadol 50 mg three times a day, and referred Ms. Lane for a psychological evaluation to determine if she qualified for a spinal cord stimulator.

16.    Ms. Lane returned to see Dr. Weber on January 23, 2019. She reported that she was not tolerating the increased dosage of Cymbalta and had cut back to one tablet per day. The Tramadol had given her only a 30% improvement in her pain and an extra hour of sleep. She was still using a rolling walker to ambulate and wore a foot brace on her left side. Dr. Weber prescribed Keppra 750 mg twice a day and continued Ms. Lane's dosage of Tramadol. Dr. Weber referred Ms. Lane to Dr. Mark Lefebvre for a psychological evaluation for the spinal cord stimulator.

17.    The next day, January 24, 2019, Ms. Lane had a follow-up appointment with Jack Bergman, PA-C at Raleigh Neurosurgical Clinic. Mr. Bergman noted that he had completed a disability form for Ms. Lane. Mr. Bergman asked her to return in 90 days.

18.    Ms. Lane next saw Dr. Weber on February 12, 2019. She reported that she continued to have pain in her lower back, on the left side greater than the right; left hip pain; and left leg pain. Her left hip pain radiated to her left lateral thigh, left calf, and the bottom of her left foot. Ms. Lane reported that the Tramadol was only giving her around 35% pain relief and one extra hour of sleep per night. She was still using a rolling walker and wearing a foot brace.

5

19.     On March 6, 2019, Ms. Lane reported to Jason Kaylor, PA-C of Raleigh Neurosurgical Clinic that she had discontinued taking Nucynta because it caused her to have vivid dreams, crying, and pain in her chest. She requested to be placed back on her prior medications, Tramadol and Gabapentin.

20.     On March 11, 2019, Ms. Lane was seen by Dr. Weber and received a trial spinal cord stimulator.

21.     On March 14, 2019, Ms. Lane met with Dr. Burnsed and reported that she had experienced relief from the trial spinal cord stimulator, which allowed her to sleep through the night. Ms. Lane brought forms to complete for her disability claim and to obtain a handicap placard. Ms. Lane reported that she was unable to ambulate for an extended time and had recently fallen and fractured ribs due to her left lower extremity deficits. Dr. Burnsed wrote that Ms. Lane was 100% disabled and unable to perform the activities of her job due to her disability. Dr. Burnsed hoped that the spinal cord stimulator would continue to give her some relief. He requested Ms. Lane to return in six months. The same day, Dr. Burnsed wrote in a letter that Ms. Lane was "unable to perform work of any kind at this time."

22.     Ms. Lane's next appointment with Mr. Kaylor was on March 18, 2019. She reported that she had experienced 55% pain relief during the spinal cord stimulator trial. Ms. Lane agreed to a permanent stimulator implant.

23.     At an appointment with Mr. Kaylor on April 4, 2019, Ms. Lane described her pain level as a constant nine out of ten or a ten out of ten, with weakness and numbness.

6

24.     Dr. Laith Khoury installed the permanent spinal cord stimulator placement on April 9, 2019.

25.     Ms. Lane next saw Mr. Kaylor on May 2, 2019. She reported that she had lower back pain, greater on the left than the right, left hip pain, and left leg pain. Her left hip pain radiated to her lateral thigh, calf, and the bottom of her foot. Ms. Lane reported a 25% improvement with the permanent spinal cord stimulator. Her pain level was a constant eight out of ten, with weakness and numbness. Mr. Kaylor refilled Ms. Lane's prescriptions for Tramadol.

26.     On May 2, 2019, a Unum employee named Esther Hoodenpyle, DMS, wrote in a report, "R&Ls remain supported."

27.     On June 20, 2019, Ms. Lane saw Brittany Ann Hodorowicz, PA-C, at Midtown Pain and Spine. Ms. Lane reported 55% relief of her pain and was "doing ok" with her spinal cord stimulator. Ms. Lane stated that her pain level was constant six or seven out of ten. Ms. Hodorowicz wrote that Ms. Lane's pain was not adequately controlled on the current medication regimen. She refilled Ms. Lane's prescription of Tramadol.

28.     Ms. Lane was interviewed by a Unum representative named Houston Ward on July 12, 2019. Mr. Ward wrote the following summary:

> ADLs: Devices for ambulation? OVN indicated she was ordering wheelchair? She has a walker she uses full-time at home. If she's outside, she uses a cane and usually tries to have someone there so she can hold on to their arm. She always has her phone w/ her be she falls a lot. Her left foot "doesn't work" - Burnsed states her foot got "caught and pinched" during her sx and lost feeling so she has drop foot. EE states she is permanently disabled and will never be RTW in any capacity. What is

7

keeping you from sedentary work w/ a 10 lifting restriction? She states she takes too much medication to work, she can barely stayy (sic) awake most days and if she doesn't take the meds, she hurts too bad.
EE doesn't sleep well, usually gets up about 4:00a to take some tylenol then she goes back to bed - usually gets up at 7, makes toaster sturdels (sic) since she can't stand for long periods. She'llt ake (sic) her meds so she can get moving - usually sits there about an hr to get up and start moving. She can shower on her own but it takes about 45 min-1 hr to shower and get dressed. Around this time it's usually lunch time and she can't stand much so she will usually just make sandwiches. She tries to dust a shelf or two a day or do small anoutns (sic) of floor cleaning – she sets a small goal each day cleaning-wise. She'll maybe do one load of clothes one day, clean the toilet the next. Her husband is also permanently disabled so he can't do much either. Her sister takes her to get her meds and groceries, she cant't (sic) push a grocery cart or walk around the store for long. She does drive but not often - last time she drove she hit someone's mirror w/ her husband's truck so she only drives if she absolutely has to and she drives only her car since it's smaller.

29.    On the same day, July 12, 2019, Mr. Ward sent a letter to Dr. Burnsed. The letter asked Dr. Burnsed to state whether Ms. Lane was able to perform a sedentary occupation on a full-time basis. Dr. Burnsed and Dr. Khoury responded on July 12, 2019. The doctors checked "yes" and added, "from a neurosurgery standpoint." In the "comments" section they wrote "patient will need to have long term disability forms filled out by PCP. We only are covering her post operatively: 10/29/18 – 7/9/19."

30.    On July 12, 2019, Unum sent an identical letter to Ms. Farringer, Ms. Lane's primary care provider. Ms. Farringer forwarded Unum's letter to Pivot Physical Therapy and requested that Ms. Lane undergo a functional capacity evaluation. Danielle from Pivot Physical Therapy called Mr. Ward at Unum to inquire about the FCE. Mr. Ward advised that Unum had not requested an FCE for Ms. Lane.

31.    On July 15, 2019, a State Employees' Credit Union representative informed Unum that Ms. Lane had been approved for Social Security disability benefits. Ms. Lane

sent Unum the Social Security Notice of Award letter dated June 10, 2019. The Notice of Award states that Ms. Lane's monthly Social Security disability benefit would be $1,432.

32.     On August 2, 2019, Mr. Ward contacted Pivot Physical Therapy and inquired whether an FCE had been completed.

33.     Ms. Lane next saw Dr. Weber on August 14, 2019. She reported 55% relief of her pain on her medications. She presented disability paperwork to be completed. Ms. Lane reported that her average pain during the preceding week was a six out of ten and her pain was a constant seven out of ten. The same day, Dr. Weber responded to Unum's July 12, 2020 letter. He checked that Ms. Lane was unable to work a sedentary occupation and added under "comments" the following: "See chart. Unable to sit for more than ten min. without rest."

34.     On August 20, 2019, Unum sent a letter to Dr. Burnsed. The letter requested Dr. Burnsed to state whether Ms. Lane could work a sedentary occupation. Dr. Burnsed responded on August 27, 2019. He checked "no" and under "comments" wrote, "Patient has a foot drop and is unable to perform her regular job duties."

35.     On September 13, 2019, Ms. Lane underwent a psychological evaluation by Dr. Mark Lefebvre, Ph.D. Dr. Lefebvre wrote a letter to Dr. Weber the same day. In it he summarized Ms. Lane's medical history and described the symptoms she was experiencing:

> Ms. Lane describes persistent pain in her left hip when she is sleeping and persistent pain in her right leg during the day. Her big toe hurts a great deal which is triggered by wearing the foot drop brace. Furthermore, now she has pain from her left knee to her foot. Notably, Ms. Lane also describes exquisite sensitivity of the foot to touch notes that the foot will

9

swell and tum purple on occasion suggestive of complex regional pain syndrome. Pain is exacerbated by activity and wearing the brace, and is worse during the night, possibly because bedsheets are lying on her foot. Pain is improved by PT, heat, tramadol and gabapentin. Ms. Lane has been seeing Dr. Weber for pain management and he has been prescribing her medicine. She strongly wants to avoid using narcotic analgesics and the spinal column stimulator is under consideration. Regarding her AOL, Ms. Lane wears a brace for her foot drop and then still uses a walker for ambulation. Her sleep is impaired, and she wakes one to two hours earlier than normal and it takes her longer to fall as1eep. As a result, she is sleep deprived secondary to pain. During the day, she "piddles" at home and cooks which she does through careful pacing.

36. Ms. Lane also advised Dr. Lefebvre that she was taking medications for depression and that she had difficulty tolerating duloxetine (Cymbalta) 60 mg, noting that it caused her dizziness and falling. Ms. Lane reported that she was suffering from dysphoria, crying spells, decreased appetite with a 20-pound weight loss in September 2019, insomnia due to "intrusive cognitions," and early-morning awakening caused by pain. Dr. Lefebvre wrote that Ms. Lane suffered from anhedonia and "suicidal ideation with plans" although he noted that Ms. Lane had stated she would not act on her feelings due to her religious convictions. Ms. Lane rated the intensity of her depression as a "ten."

37. Dr. Lefebvre determined from Ms. Lane's MMPI-2 profile that she had a high degree of somatic preoccupation, which indicated that her chronic pain was a central feature of her emotional life; intense depression; anxiety; and emotional distress. Ms. Lane scored a 21 on the Beck Depression Inventory-II, which in a chronic pain patient is indicative of severe depression. Dr. Lefebvre wrote, "Much of her pain depression is related to chronic pain, and if this is significantly helped by spinal column stimulation her depression should improve significantly."

10

38.     On the Multidimensional Pain Inventory administered by Dr. Lefebvre, Ms. Lane reported above-average levels of punitive responses from family members, interference of pain with her life, and emotional distress related to pain. Dr. Lefebvre commented that Ms. Lane's scores suggested that she was having difficulty coping with her pain condition and that she received minimal if any support from her family regarding her pain.

39.     Ms. Lane was admitted to Holly Hill Hospital due to the stress of dealing with the aftermath of her car accident. On September 16, 2020, Ms. Lane woke up clawing at her face and was afraid she was going to hurt herself. Her family doctor referred her to Holly Hill. She told the staff physician that she had suicidal thoughts and a plan to overdose with her prescription medications. Ms. Lane stated that her parents suffered from depression and bipolar disorder and her mother had attempted suicide. Ms. Lane had been taking Zoloft and Lamictal. The staff physician diagnosed her as having major depressive disorder, recurrent, severe. During Ms. Lane's hospital stay, she continued taking Zoloft 50 mg once a day and was given lithium 300 mg twice a day. Ms. Lane was discharged on September 25, 2019.

40.     Ms. Lane began psychiatric treatment with Natalie Ball, PA-C of Mindpath Care Center on September 30, 2019. Ms. Lane arrived at her appointment using a walker. She described her symptoms of depression, anxiety, mania, mood disorder, and psychosis. The last episode of psychosis had been on September 24, 2019. Ms. Lane explained that she had seen a shadowy figure out of the corner of her eye for the past six months. She denied suicidal ideation. Ms. Lane's PHQ-9 score was 20 and her GAD-7

11

score was 14. Ms. Ball's diagnoses were bipolar disorder, current episode depressed, severe with psychotic features, and generalized anxiety disorder with panic disorder. Her plan was to continue Ms. Lane's medications, including lithium ER 300 mg twice a day, Zoloft 50 mg daily, and Lamictal 25 mg daily.

41.     Ms. Lane was seen by Dr. Burnsed on September 27, 2019. she reported that she had recently been hospitalized at Holly Hill Hospital due to suicidal ideation. Ms. Lane denied any current suicidal plans during her visit with Dr. Burnsed. He noted that she was always using a rolling walker. Dr. Burnsed wrote that he was "willing to help facilitate her disability paperwork on (sic) any capacity."

42.     Ms. Lane was examined by Ms. Hodorowicz on October 14, 2019. Ms. Lane stated that she was weaning off lithium over the next two weeks and had started taking Vraylar for her bipolar disorder. Ms. Lane advised that her pain level was a constant six out of ten.

43.     Unum advised Ms. Lane by a letter dated November 8, 2019 that her claim had been assigned to Nancy Smith. On November 15, 2019, Ms. Smith wrote to Dr. Burnsed. Dr. Burnsed responded on November 18, 2019 that Ms. Lane could not perform a sedentary occupation and wrote in the "comments" section: "Patient can not perform any heavy lifting, bending, twisting or pulling of any sort."

44.     Ms. Hodorowicz next saw Ms. Lane on November 11, 2019. Ms. Lane reported that her psychiatrist had taken her off Cymbalta two days earlier because she was having panic attacks. She was having increased left low back and left leg pain. Ms. Lane was discouraged at the progress being made with her medications and the

stimulator. She reported only 30% pain relief and a constant pain level at nine out of ten. Ms. Lane stated that "her pain management is more important than keeping her panic attacks under control," so she was interested in resuming taking Cymbalta. Ms. Lane felt that her panic attacks occurred because she was now one year past her fusion surgery and was now the best she would be.

45.    Ms. Lane saw Dr. Weber on December 19, 2019. She was having increased right knee pain and swelling that had worsened with physical therapy. She was scheduled to have a right total knee replacement in January 2020. Ms. Lane rated her constant pain at a nine out of ten, with weakness and numbness.

46.    Unum representative Nancy Smith wrote in a report dated December 19, 2019 that the medical records did not support that Ms. Lane was unable to perform the functional demands of her occupation as outlined by Unum's vocational specialist. The same day, a Unum physician named Dr. Tony Smith wrote that he agreed with Ms. Smith's assessment but added that "we do need to clarify BH treatment/provider (s) (pain mgnt records mention psychiatrist) at this time."

47.    On January 8, 2020, Unum sent a letter to Dr. Weber and inquired whether in his view Ms. Lane was able to work in a sedentary occupation. Dr. Weber checked "no" and wrote: "She is permanent disability per Social Security. Her condition will be constant and not change." Dr. Weber signed his response on January 21, 2020.

48.    On the same day, January 8, 2020, Unum sent a letter to Dr. Lefebvre and asked whether he was keeping Ms. Lane out of work. Dr. Lefebvre checked "no" and signed the response on January 22, 2020.

13

49.     On February 3, 2020, Ms. Lane underwent a right total knee replacement by Dr. Timothy Harris.

50.     Ms. Lane next saw Ms. Hodorowicz on February 26, 2020. She reported that she had undergone a right total knee replacement and was improving slowly from the surgery. Her spinal cord stimulator was helping with her back and hip pain. Ms. Lane rated her average pain during the past week as a nine out of ten. Ms. Hodorowicz continued her prescription for Norco so that Ms. Lane could continue with physical therapy.

51.     On March 23, 2020, Unum sent a disability inquiry to Ms. Lane's knee surgeon, Dr. Timothy Harris. Dr. Harris wrote that Ms. Lane was unable to work a sedentary occupation and added in the comments section: "Patient is still recovering from joint replacement surgery on 2/3/20 Right TKA. She must be out 3 months from date of surgery."

52.     Ms. Hodorowicz next saw Ms. Lane on March 25, 2020. Ms. Lane rated her constant pain at an eight or nine out of ten. Ms. Hodorowicz wrote that Ms. Lane was not adequately treated on the current pain regimen. She refilled Ms. Lane's prescriptions.

53.     On May 4, 2020, Unum decided to contact Ms. Farringer to inquire whether a referral to physical therapy for an FCE had occurred and whether she was advising that an FCE is necessary to confirm Ms. Lane's functional capacity. An employee at Ms. Farringer's office named "Summer" advised that a referral was made to determine Ms. Lane's functional capacity but the FCE was never done. According to Ms. Smith's note,

14

Summer added that "at this time since the EE is being seen by specialist NP Farringer would defer to specialist for work capacity."

54.     The same day, Ms. Smith spoke with "Ingrid" and "Sandy" from Dr. Harris' office who stated that Ms. Lane had been released from Dr. Harris' care with no restrictions or limitations related to her right total knee replacement surgery.

55.     On May 7, 2020, Unum physician Dr. Smith sent Dr. Weber a letter with questions. On May 14, 2020, Unum called Dr. Weber's office to inquire about his response to Unum's May 7, 2020 letter. "Emily" from Dr. Weber's office advised that Ms. Lane had an appointment with Dr. Weber on May 20 and would fill out the form and sign it.

56.     Ms. Lane was interviewed by Unum employee Nancy Smith on May 4, 2020. Ms. Smith's report includes the following statements:

> Daily Activities: She gets up around 8:00 has a bowl of cereal so she does not have to stand awhile, tries to do a little housework sweep floor, wash dishes. Stays in house as she has to use a walker. Due to her dropped foot on left side. Fixes lunch sandwich or soup.
> In after noon she does a lot of sitting.
> At night she and her husband tries to cook a real meal takes a couple of hrs. She goes to bed at 9:00 PM.
> She can drive about 15 minutes, has to have someone to go with her. Sister goes with her to the grocery store as she can't push cart. She stays in the grocery store only 15 minutes she only goes on aisles that she needs to go on per her list. Sister checks out for her as she has to sit down. It wears her out. She goes to the grocery store once a week and it is Food Lion.
> Her son lives next store, he does all the outside work and cooks a couple of meals.
>
> Her husband is able to take care of his own personal needs and does need any medical care.
> She is able to take care of her own personal needs.

57.     On May 5, 2020, Ms. Lane saw Patricia Lynn McGrail, NP at Raleigh Pain and Spine for medication refills. Ms. Lane was taking Tramadol and Gabapentin and reported over 60% relief with her medications. She was pleased with the results of her right total knee replacement. The report states that that Ms. Lane described her pain as "a constant 7/10" and "sharp." She reported weakness and numbness and parathesias. Her pain affected her activities of daily living, caused sleeping difficulties, and increased with sitting, walking, and car rides. Ms. Lane stated that her pain during the past week averaged 6/10 and 8/10 and that the current medication regimen had not adequately controlled her pain and had not improved her activities of daily living. She was experiencing nausea. The report states that Ms. McGrail's "overall impression" was that "Ms. Lane may benefit from chronic pain management." Ms. McGrail informed Ms. Lane that she would have to make another appointment to have her disability paperwork completed. Ms. McGrail wrote:

> She is asking for us to fill out long term disability paperwork. I informed her that she will have to set up another visit for paperwork and she should obtain copies of what Dr. Weber previously filled out as we do not have copies. She will scheduled (sic) once she obtains copies.

58.     Unum advised Ms. Lane by a letter dated June 1, 2020 that her claim had been terminated. Unum obtained reports from two reviewing physicians. Dr. Tony Smith disagreed with the opinion of Ms. Lane's pain management specialist, Dr. Thomas Weber, and opined that Ms. Lane's documented physical examination findings were not consistent with her stated level of physical impairment. Dr. Jamie Lewis concurred with Dr. Smith and stated that Dr. Weber's opinion was not well supported by the medical

16

records. The letter stated that Ms. Lane had the right to appeal within 180 days from her receipt of Unum's termination letter.

59. Ms. Lane saw her podiatrist, Dr. Jordan Meyers, on June 9, 2020 for an evaluation of her left foot. Dr. Meyers' report states that Ms. Lane's symptoms were improved by her use of the custom brace – "Symptoms improved by: custom brace." However, Dr. Meyers noted "very unsteady gait still, andgetting (sic) worse." Ms. Lane rated her pain level to be a four out of ten and she was "even considering elective amputation." Ms. Lane told Dr. Meyers that her foot remained constantly numb, and she was experiencing sharp shooting sensations from her forefoot through her hallux and cramping in her left lower leg when she removed her compression socks. Dr. Meyers' physical exam findings included "hypersensitivity, skin color changes, hyperreflexes and clonus noted with drop foot," and pain in the "4th MTP joint left foot." Ms. Lane stated that she was still falling on occasion. Under "Patient instructions," Dr. Meyers recommended stretching exercises, anti-inflammatory medications, steroid or plant extract injection therapy, reduced activity, and a CAM boot. Ms. Lane had a "very unsteady gait still," which was getting worse. Ms. Lane stated that she understood "she will continue to have pain, sometimes sever pain, for the rest of her life." The report concludes, "we will do all we can to help her continue to get around, and minimize her daily pain and challenges of simple tasks with activities of daily living."

60. Ms. Lane has continued to see Ms. Ball regularly for psychiatric care. Ms. Ball's report of examination dated July 7, 2020 states that Ms. Lane was taking Vraylar 1.5 mg daily, Buspar 6 mg one to two tablets as needed for anxiety, and Cymbalta 60 mg

17

twice a day. Ms. Lane felt her mood was generally stable but her anxiety level was high. Her mental status exam was improved. Ms. Ball noted that Ms. Lane ambulated using a walker.

61.    Ms. Lane next saw Ms. McGrail on July 15, 2020. The report states that Ms. Lane described her pain as "a constant 7/10" and "sharp," she reported weakness and numbness and parathesias, and her pain affected her activities of daily living, caused sleeping difficulties, and increased with sitting, walking, and car rides. Ms. Lane stated that her pain during the past week averaged 6/10 and 8/10 and that the current medication regimen had not improved her activities of daily living. She was experiencing nausea.

62.    On September 2, 2020, Ms. Lane reported to Ms. Ball that she had not been sleeping well due to her pain. Her back pain had worsened during the past two weeks and it was waking her up, resulting in very poor sleep. Ms. Lane reported that she was "doing ok mood-wise, not as good as she had been." She reported suicidal ideation but denied having a plan or intent. Ms. Ball continued her medications.

63.    Ms. Lane submitted an appeal to Unum dated November 17, 2020. The appeal letter included records from her medical providers, a report of a functional capacity evaluation completed on September 16, 2020, and functional capacity forms completed by Ms. McGrail and Ms. Farringer.

64.    Ms. Farringer referred Ms. Lane for a functional capacity evaluation to determine her current functional and work abilities. Ms. Lane was evaluated by William E. Booth, PT of Pivot Physical Therapy in Cary, North Carolina on September 16, 2020.

65.     Mr. Booth found that Ms. Lane gave a full physical effort during the testing and that her subjective reports of pain and disability were both reasonable and reliable. Ms. Lane arrived for her FCE using a rolling walker and was wearing an ankle brace on her left foot due to her foot drop. She reported that she was involved in a motor vehicle accident on September 23, 2018 and sustained a low back injury that subsequently resulted in lumbar fusion surgery on October 29, 2018. Ms. Lane developed a left-sided foot drop following the surgery. The surgeon performed another operation on December 14, 2018 to repair a poor bone graft, but the surgery did not resolve Ms. Lane's foot drop. Ms. Lane advised Mr. Booth that she had increased low back pain and left leg pain, she has difficulty taking care of her husband who had had multiple strokes, and she was relying on her son and sister for some activities of daily living such as grocery shopping. Ms. Lane told Mr. Booth that her pain level was a five out of ten when she arrived at his offices and went up to an eight out of ten during the FCE.

66.     Mr. Booth found that Mr. Lane had no Achilles deep tendon reflex on her left side and that muscle strength in her tibialis anterior was a zero out of five. Ms. Lane had significantly decreased lumbar active range of motion and core strength. Mr. Booth did not have Ms. Lane undergo the treadmill test due to his concerns about her safety. Ms. Lane was only able to walk around the gym with her rolling walker for four minutes. She walked only 310 feet before she requested to sit down and rest due to fatigue and increased low-back pain. She had a couple of instances when she caught her left toe on the carpet and stumbled slightly. She was unable to get into a crouch/squat position due

19

to increased pain. Ms. Lane's low back pain increased after she lifted 2.5-pound dumbbells off a table height for three repetitions.

67. Mr. Booth opined that Ms. Lane was unable to return to her previous job as a Mortgage Loan Processor. He found that Ms. Lane was unable to perform 11 of the 12 critical physical demands of her job and that the other one, writing, she was able to perform only with difficulty. Mr. Booth found that Ms. Lane's subjective reports of pain and disability were both reasonable and reliable.

68. Ms. Lane's pain management provider, Patricia McGrail, NP, wrote in a Functional Capacity Questionnaire form dated November 11, 2020, that Ms. Lane was suffering from spinal stenosis of the lumbar region without neurogenic claudication. Ms. McGrail wrote that Ms. Lane and tried epidural steroid injections without relief and was under treatment with a spinal cord stimulator, opioid medications, muscle relaxants, NSAIDs, and neuropathic medications. Her symptoms included low back pain, left lower extremity radiculopathy, and bilateral upper and lower extremity muscle spasms. Ms. McGrail wrote that her opinion was supported by lumbar MRI findings, lumbar x-rays, and an EMG/NCS study. She noted that Ms. Lane utilized a rolling walker and a left AFO device. Ms. McGrail opined that Ms. Lane was disabled from performing any occupation and was unable to sit for more than 45 minutes, stand for more than seven minutes, walk for more than four minutes, or perform computer work for more than 45 minutes.

69. Ms. Farringer completed a Functional Capacity Questionnaire form on November 11, 2020. She wrote that Ms. Lane suffered from chronic lower back pain, foot

drop, fatigue, anxiety and depression, and bilateral knee pain. She referenced Mr. Booth's functional capacity evaluation findings and opined that Ms. Lane was unable to work in any occupation. According to Ms. Farringer, during a work day Ms. Lane could sit for up to one hour, was unable to stand and walk, and could perform computer work for no more than one hour.

70. Unum denied Ms. Lane's appeal. Unum's February 17, 2021 letter states that "the information in the claim file supports her ability to perform the duties of her regular occupation as it is normally performed in the national economy." The letter states that Ms. Lane had to right to bring a civil suit under Section 502(a) of ERISA.

<u>Claim for Relief</u>
(29 U.S.C. § 1132(a)(1)(B) and (g))

71. The other allegations of this complaint are incorporated by reference.

72. The Policy is an employee welfare benefit plan within the meaning of ERISA. Ms. Lane is covered by the Policy.

73. Unum failed to provide Ms. Lane a full and fair review of her claim for benefits under the Policy.

74. Ms. Lane is entitled to recover from Unum long-term disability benefits under the Policy from June 2, 2020 to the date of judgment, with prejudgment interest, and continuing monthly benefits after the date of judgment for as long as she remains eligible under the terms of the Policy.

75. Ms. Lane requests an award of attorney's fees and costs against Unum pursuant to 29 U.S.C. § 1132(g).

21

## Prayer for Relief

Wherefore, having complained of Unum, Ms. Lane prays the Court for the following relief:

      1.      A judgment that Unum is obligated under the Policy to pay Ms. Lane long-term disability benefits from June 2, 2020 to the date of judgment, with prejudgment interest;

      2.      A judgment that Unum is obligated to pay Ms. Lane monthly disability income benefits from the date of judgment for as long as she remains eligible for such benefits under the terms of the Policy;

      3.      An award of attorney's fees and costs against Unum pursuant to 29 U.S.C. § 1132(g); and

      4.      Such other relief as the Court deems just and proper.

March 12, 2020
Date

/s/ Andrew Whiteman
Andrew Whiteman
N.C. State Bar Number 9523
Whiteman Law Firm
5400 Glenwood Ave., Suite 225
Raleigh, North Carolina 27612
Tel: (919) 571-8300
Fax: (919) 571-1004
aow@whiteman-law.com

22